UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

|   |   |
|---|---|
| STACY JACKSON, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )   Civil Action No. |
|  | ) |
| AMAZON.COM SERVICES, LLC., | )   _____ |
|  | ) |
| Defendant. | ) |

_____

## COMPLAINT AND JURY DEMAND

## PARTIES

1.      The Plaintiff, Stacy Jackson ("Mr. Jackson" or the "Plaintiff"), is an adult male resident of the state of New York, residing in Buffalo, New York 14215.  Buffalo, NY is in Erie County.

2.      Defendant Amazon.com Services, LLC (the "Company" or the "Defendant") is a foreign for-profit corporation doing business in the state of New York.  The Company is incorporated in Delaware and, upon information and belief, its principal office is located at 410 Terry Avenue North, Seattle, WA 98109.

## JURISDICTION AND VENUE

3.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought a claim pursuant to the Title VII. The court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

4.      Venue is appropriate in the Western District of New York as the acts or omissions giving rise to the claims in this Complaint occurred in the Western District of New York.

5.      This court has personal jurisdiction over the Company because the Company has engaged in and transacted business in the State of New York, including by managing and/or operating a business in New York and/or by employing Mr. Jackson in New York, and Mr. Jackson's causes of action stem from the Company's business transactions within the State of New York.  Indeed, Mr. Jackson was employed by the Company in the State of New York, was managed and supervised by the Company in the State of New York, was discriminated against and harassed by the Company in the State of New York and was terminated by the Company in the State of New York. In addition, the Company is registered with the New York Department of State's Division of Corporations.

## STATEMENT OF FACTS

6.      At all relevant times, Mr. Jackson was an African American man with dark black skin color.

7.      Mr. Jackson was born in 1968 and was, at all relevant times, over 40 years old.

8.      In or around November 23, 2019, Mr. Jackson was hired as an Associate by the Company working in a Company facility in Lancaster, New York.

9.      At all relevant times, the Company employed 20 or more employees for 20 or more calendar weeks in the previous calendar year.

10.     As such, the Company was an employer under state and federal anti-discrimination laws, such as Title VII of the Civil Rights Act ("Title VII"), New York State Human Rights Law, and the Age Discrimination in Employment Act ("ADEA").

11.     At all relevant times, Mr. Jackson was a qualified employee, and his performance was satisfactory.

12. Indeed, in or around 2020, because of Mr. Jackson's strong performance, he was promoted to the position of Learning Ambassador.

13. As a Learning Ambassador, Mr. Jackson assisted in the training of new Associates.

14. Mr. Jackson was found to be the best Learning Ambassador for the year of 2020, which was measured by the number of trainees he trained who were able to work at the required speed and quality level in the required time frame.

15. In or around January 2021, Jessica Serafin ("Serafin"), became the Area Manager and, at all relevant times thereafter, was Mr. Jackson's direct supervisor.

16. Serafin is a non-African American individual with skin color significantly lighter than that of Mr. Jackson, and, upon information and belief, Serafin is at least two decades or more younger than Mr. Jackson.

17. Notably, Mr. Jackson is currently in his late 50s.

18. On or around April 6, 2021, Mr. Jackson was tasked with training Hailey Cummings ("Cummings"), a new associate.

19. Cummings was a non-African American individual and was at least three decades younger than Mr. Jackson.

20. On or around April 8, 2021, Cummings allegedly claimed Mr. Jackson was training her improperly by asking her questions (which was a standard part of the required procedure for training).

21. It was clear that Cummings's allegations against Mr. Jackson were baseless and based on discriminatory bias (based on his race and/or age).

22.    Despite the lack of evidence that Mr. Jackson had done anything improper, thereafter Serafin no longer allowed Mr. Jackson to train a variety of positions (that he was able to train before).

23.    Around this same time, Serafin started to target Mr. Jackson with unjustified disparate treatment, seemingly based on discriminatory bias.  For example, without justification, Serafin suspended Mr. Jackson from his role as a Learning Ambassador.  This constituted a demotion.

24.    The next day, on or around April 9, 2021, Mr. Jackson contacted Jerrell Williams ("Williams"), the Manager of Learning, to confirm and verify that he (Mr. Jackson) was in fact handling the training process properly, including by asking the trainee (Cummings) questions.

25.    Williams confirmed Mr. Jackson was correctly following the training procedure and noted that he should not be suspended from his training role on the clearly false and baseless claims that Mr. Jackson was somehow training improperly.

26.    This further confirmed Mr. Jackson's suspicion that Serafin was improperly biased against him, seemingly for discriminatory reasons.

27.    In or around April 2021, a coworker, Ahmad Notarangelo ("Notarangelo"), told Mr. Jackson that Serafin had made hostile comments threatening Mr. Jackson's job in a discriminatory manner.

28.    On or around April 15, 2021, Serafin gave Mr. Jackson a baseless write up for alleged issues with supposed excessive time off task, social distancing, and side conversations.

29.    Notably, Mr. Jackson was able to see his time off task number on the Company computer, which was less than ten minutes.

30.    Importantly, time off task under ten minutes was considered a normal and acceptable level and was not considered a violation or a basis for a write-up or other discipline by the Company.

31.    Additionally, Mr. Jackson had been social distancing as required.

32.    Similarly, Mr. Jackson had not engaged in side conversations, and certainly not in any way barred under the Company's policies.

33.    Indeed, the alleged side conversations were work-related conversations with management, which were not considered to be side conversations under Company policy.

34.    Notably, numerous non-African American and younger employees routinely engaged in the same behavior as Mr. Jackson and these individuals were generally not disciplined for this conduct.  Indeed, non-African American and younger employees periodically engaged in clear violations of Company policy (unlike Mr. Jackson) and they were often not disciplined for these clear policy violations even though their infractions were clearly more serious than what Mr. Jackson had been accused of.

35.    Accordingly, it was clear that the write-up issued by Serafin was an unjustified attempt to target Mr. Jackson in an unfair disparate manner, seemingly for discriminatory reasons.

36.    On or around May 16, 2021, Mr. Jackson raised protected concerns to Paola Cruz ("Cruz"), Senior Human Resources Associate, regarding Serafin's discriminatory treatment of himself (including the improper demotion).

37.    Cruz took no meaningful action to address Mr. Jackson's protected concerns.

38.    Upon information and belief, Serafin was notified that Mr. Jackson had conveyed protected concerns to human resources, including related to potential discriminatory treatment.

39.     Later that same day, on or around May 16, 2021, Mr. Jackson raised protected concerns with Michaela Held ("Held"), a human resources manager, regarding Serafin's discriminatory treatment of him.

40.     Held investigated Mr. Jackson's protected concerns and determined, on or around June 5, 2021, that Serafin violated the standard of conduct in her issuance of discipline towards Mr. Jackson.  Hence the Company's own investigation showed that Mr. Jackson had been treated improperly and in an overly harsh and disparate manner by Serafin.

41.     After Mr. Jackson raised protected concerns about Serafin's discriminatory treatment of himself, Serafin began targeting Mr. Jackson with retaliatory treatment, including further unwarranted discipline.

42.     Notably, Serafin was not disciplining non-African American, lighter skinned, and/or younger employees for the same alleged infractions.

43.     In contrast to the harsh treatment of Mr. Jackson, Serafin's discriminatory conduct clearly resulted in favorable treatment to the Caucasian, lighter skinned, non-African American, and/or younger Associates.

44.     Additionally, the Company regularly promoted Caucasian, lighter skinned, non-African American, and/or younger Associates, while passing over similarly qualified, darker skinned, African American, and/or older Associates (like Mr. Jackson).

45.     For example, Bryan Webb ("Webb"), an associate who had been a trainee under Mr. Jackson (and therefore was less senior and/or less qualified than Mr. Jackson), was promoted to a Learning Ambassador several months after being hired and then subsequently was promoted into a higher level Process Assistant ("PA") position approximately six or seven months later.

46. Serafin further favored Webb by giving him the privilege to be an acting PA even before he was promoted.

47. Webb was a non-African American individual in his 20s (in terms of age)

48. Further, Webb's metrics (and therefore his performance) were lower than Mr. Jackson's metrics. Hence, Web's performance at the time of his promotions was worse than that of Mr. Jackson.

49. Despite this, Webb was selected for promotion over Mr. Jackson, clearly for discriminatory reasons.

50. These promotions were based, in whole or in part, upon the recommendations of Serafin, and Serafin was motivated by discriminatory and retaliatory bias against Mr. Jackson and in favor of younger and lighter skinned employees.

51. In or around late May 2021, Joseph Blotzer ("Blotzer"), an area manager, set up a meeting with Serafin, Diane Matteucci ("Matteucci"), an area manager, and Mr. Jackson.

52. During this meeting, Mr. Jackson again raised protected concerns regarding the racially discriminatory treatment he had experienced and was continuing to experience and he continued to be retaliated against.

53. During the meeting, Serafin was visibly angry with Mr. Jackson for raising protected concerns and reporting her discriminatory behavior.

54. No meaningful change came from this meeting.

55. In fact, Serafin began to treat Mr. Jackson even worse for retaliatory reasons and continued to target Mr. Jackson with discriminatory and unjustified discipline.

56. On or around June 5, 2021, Mr. Jackson raised protected concerns to the Employee Relations Commission ("ERC") regarding Serafin's ongoing harassment, discrimination, and retaliation.

57. Upon information and belief, Serafin was again notified of Mr. Jackson's expression of protected concerns.

58. The Company again failed to take any meaningful actions to address Mr. Jackson's protected concerns.

59. Indeed, Serafin continued to target Mr. Jackson with discriminatory and/or retaliatory reprimands and discipline.

60. Aisha Barnes ("Barnes"), the Area Manager, also discriminated against Mr. Jackson because of his race, color, and/or age.

61. For example, on or around September 29, 2021, Barnes called Mr. Jackson "lazy" and attempted to take away Mr. Jackson's computer permissions, effectively removing Mr. Jackson from the Transship Department.

62. Importantly, Mr. Jackson was not doing anything that could be characterized as "lazy" and, based on the nature and tone of Barnes's comment, it was clear Barnes was referring to Mr. Jackson's race and/or age, and was using racial and age-related stereotypes, in a discriminatory manner.

63. Barnes was at least a decade or more younger than Mr. Jackson.

64. That same day, Mr. Jackson raised protected concerns about the discriminatory treatment with Human Resources Representatives Michael Seaburn and Analisa (last name unknown, "Analisa").

65. Analisa confirmed that Barnes could not take away Mr. Jackson's computer permissions.

66. In or around November 2021, Mr. Jackson asked Human Resources for a copy of his personnel file.

67. Only then, by looking at a copy of his file, did Mr. Jackson learn that Serafin had prepared write-ups against Mr. Jackson.

68. Mr. Jackson had never been notified about many of the write-ups, and some of them were made within minutes of each other.

69. Strangely (and in violation of standard company policies and procedures) the write-ups were secretly inserted in Mr. Jackson's file without ever being shown to Mr. Jackson.

70. Further, the write-ups were reprimanding Mr. Jackson for alleged behavior that, even if it has occurred, was not even in violation of Company policy (and thus these write-ups were clearly unjustified and were a clear pretextual attempt to secretly paper Mr. Jackson's file in order to justify further discriminatory and retaliatory adverse actions against him).

71. Further, the behavior that Serafin claimed Mr. Jackson had engaged in was behavior that lighter skinned, non-African American, and/or younger employees routinely engaged in, but were not similarly disciplined for (as the behavior was not in violation of Company policy).

72. As such, it was clear Serafin's secret filing of these additional write-ups was clearly based on discriminatory and/or retaliatory animus due to Mr. Jackson's race, color, age, and/or because he had engaged in protected activities.

73. In or around December 2021, Mr. Jackson raised protected concerns to the ERC regarding the ongoing discrimination and retaliation he (Mr. Jackson) was being subjected to at the Company.

74. Stephen (last name unknown "Stephen"), Human Resources Manager, determined that several of the writeups were issued in retaliation, and those writeups were rescinded.

75. However, despite raising protected concerns to the Company, the discriminatory promotion practices and the discriminatory issuing of discipline (targeting Mr. Jackson negatively and favoring non-African American and/or younger employees) continued.

76. For example, white Associates were consistently promoted away from Processing, which was the entry level job (and therefore less desirable), and were instead assigned to other roles without hitting the production targets and other requirements necessary for advancement outlined in the Employee Handbook.

77. As another example, in or around February 2022, a white associate, Rob Geandreau ("Geandreau"), committed a serious safety violation, which was witnessed by Area Manager Baljit "Rocky" Singh ("Singh"), Associate Dan Stucker ("Stucker"), and Michael O'Reilly ("O'Reilly"), PA.

78. Geandreau was not disciplined for his serious safety violation.

79. Geandreau is a non-African American employee in his 30's in terms of age.

80. Singh is a non-African American individual at least two decades younger than Mr. Jackson.

81. On or around March 22, 2022, Mr. Jackson again raised protected concerns to the ERC about the continued discrimination he (and others faced) due to his (and their) race and color.

82. Mr. Jackson's complaint was allegedly investigated by Matthew Gorbaty ("Gorbaty"), the Senior Human Resources Investigator.

83. As part of Mr. Jackson's complaint, Mr. Jackon noted that an employee ("R") had been violating the Company's TDR process (related to the inspecting of trailers and trucks docked at the Company facility) including in front of Singh. Mr. Jackson's complaint further noted that, despite this, Singh only provided a verbal reprimand to R.

84. Notably, R is white, Caucasian, and more than two decades younger than Mr. Jackson.

85. Mr. Jackson's complaint explicitly noted that he "and other employees . . . have been discriminated against because of their race, and R, being Caucasian, is not being penalized."

86. Upon information and belief, Mr. Jackson's Area Managers were aware of the fact that Mr. Jackson raised these protected concerns, including Singh, Serafin, Blotzer, and Matteucci.

87. Despite these protected concerns, the Company failed to take any meaningful action to stop the discrimination, and Mr. Jackson continued to be subjected to discriminatory and retaliatory treatment, including a hostile work environment on a near daily basis.

88. Indeed, Mr. Jackson's supervisors repeatedly subjected him to ostracization and denied him opportunities for advancement within the Company. Furthermore, these same supervisors spent disproportionate amounts of their days closely scrutinizing and unfairly monitoring Mr. Jackson, clearly searching for any reason to further reprimand and/or terminate Mr. Jackson's employment.

89.     Notably, this was in sharp contrast to how these same supervisors treated younger, non-African American, and/or lighter skinned coworkers and/or coworkers who had not engaged in protected activities.

90.     Furthermore, despite the investigation finding "evidence to confirm [Mr. Jackson's] allegations that Singh favored [R] by not holding him accountable for a TDR violation which is a category 2 violation," the investigation implausibly concluded there was "no evidence to confirm [Mr. Jackson's] allegation he was discriminated against due to his race."

91.     As part of this investigation, Singh was interviewed by Gorbaty.

92.     During the interview, Singh asserted there were a few "bad apples" at the Company's location.  When providing examples, Singh explained the bad apples were "a few associates in issues with HR" and specifically referred to Mr. Jackson himself.

93.     As such, it was clear—and clear to the Company—Singh was biased against, and retaliating against, Mr. Jackson because of his prior expressions of protected discrimination concerns to human resources.

94.     On or around April 12, 2022, Mr. Jackson again raised protected concerns to the ERC about the race-based discrimination at the Company.

95.     On or around April 18, 2022, Mr. Jackson emailed Gorbaty, a member of HR, asking Gorbaty to contact him as "retaliation is taking place and they are targeting me."

96.     Despite this, Gorbaty dismissed Mr. Jackson's concerns and refused to contact Mr. Jackson.

97.     On or around April 19, 2022, Kim Woojoo ("Woojoo"), a human resources representative, disciplined Mr. Jackson for allegedly incorrectly spotting on or around April 12, 2022 (i.e., the same day Mr. Jackson had raised further protected concerns).

98.    Upon information and belief, Woojoo was acting on the instruction of David Wynn ("Wynn"), the manager of human resources.

99.    Woojoo and Wynn are non-African American individuals at least two decades younger than Mr. Jackson.

100.    Importantly, on or around the day in question, Mr. Jackson was spotting the way that he had been trained to spot (and which had not been raised as an issue prior).

101.    On or around April 19, 2022, Mr. Jackson was involuntarily terminated from the Company by Woojoo.

102.    Woojoo stated that Mr. Jackson was being terminated because he had supposedly spotted incorrectly (on the same day he raised protected discrimination concerns to HR).

103.    Notably, despite Mr. Jackson's protests that the termination was clearly retaliatory and request to appeal the decision to terminate him, the Company refused to overturn the decision.

104.    Importantly, even if Mr. Jackson had been spotting incorrectly (which he was not), the Company improperly treated the violation as a more serious violation than it should have been considered as per Company policy.

105.    For example, spotting is performed in two person teams, and the employee Mr. Jackson was working with while spotting was not similarly reprimanded.  The Company's decision not to discipline (and not to fire) the other employee who was equally responsible for spotting duties that day clearly shows that the Company was using this as a pretextual excuse to fire Mr. Jackson and to cover up the clearly discriminatory and retaliatory motives for the termination.

106.    Indeed, Richard Youhess ("Youhess"), the other individual, is white and, upon information and belief, in his 30s in terms of age.

107.    Upon information and belief, Mr. Jackson was replaced by a younger, non-African American, and/or lighter skinned employee.

108.    On or around May 5, 2022, Mr. Jackson timely filed a Charge of Discrimination (the "Charge") with the New York State Division of Human Rights (the "NYDHR") (Charge Number: 10217838) and cross-filed with the Equal Employment Opportunity Commission (the "EEOC") (Charge Number: 16GC202892).

109.    Mr. Jackson subsequently amended the Charge in or around December 2022.

110.    On or around November 30, 2023, Mr. Jackson received a finding of Probable Cause from the NYDHR in which the NYDHR found there was probable cause to believe that the Company had discriminated against and retaliated against Mr. Jackson.

111.    On or around June 20, 2025, Mr. Jackson notified the NYDHR of his intent to pursue this matter in Court.

112.    On or around June 26, 2025, the NYDHR issued a release of jurisdiction in the form of an administrative convenience dismissal to Mr. Jackson with a letter permitting Mr. Jackson to proceed in court.

113.    On or around August 8, 2025, the EEOC issued Mr. Jackson a right to sue notice.

114.    This lawsuit is timely filed.

## COUNT I

**(Race and Color Discrimination in Violation of New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Plaintiff v. the Company**

115. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

116. At all relevant times, the Company was an employer as defined by the New York State Human Rights law, including, but not limited to, because the Company employed 4 or more individuals.

117. The Company, by and through its agents, harassed and discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of Plaintiff's race (African American) and/or color (black and/or darker skin color).

118. More specifically, the Company subjected Plaintiff to adverse actions, including, but not limited to, a a hostile and harassing workplace, improper and intrusive monitoring, unjustified and/or overly harsh discipline and reprimands, and the termination of Plaintiff's employment because of Plaintiff's race and/or color.

119. The Company's actions were wanton, malicious, and/or oppressive. The Company likewise acted willfully and/or with reckless disregard to the state-protected rights of Mr. Jackson.

120. As a direct and proximate result of the Company's violations of New York law, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

121. Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, emotional distress damages, compensatory damages (including, but not limited to, future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, restoration of his employment, attorneys' fees, interest, and costs.

## COUNT II

### (Race and Color Discrimination in Violation of Title VII, 42 U.S.C. §§ 2000e, et seq.)
### Plaintiff v. the Company

122.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

123.    During all relevant periods the Company was an employer under Title VII, 42 U.S.C. §§ 2000e, et seq. (hereinafter, "Title VII") because it was a person engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks during the relevant calendar years.

124.    The Company, by and through its agents, harassed and discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of Plaintiff's race (African American) and/or color (black and/or darker skin color).

125.    More specifically, the Company subjected Plaintiff to adverse actions, including, but not limited to, a hostile and harassing workplace, improper and intrusive monitoring, unjustified and/or overly harsh discipline and reprimands, and the termination of Plaintiff's employment because of Plaintiff's race and/or color.

126.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Mr. Jackson.

127.    As a direct and proximate result of the Company's violations of Title VII, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

128.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, restoration of his employment, attorneys' fees, interest, and costs.

## COUNT III

**(Discrimination Based on Age in Violation of New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Plaintiff v. the Company**

129.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

130.    At all relevant times, the Company was an employer as defined by the New York State Human Rights law, including, but not limited to, because the Company employed 4 or more individuals.

131.    The Company is an employer under the definition of Executive Law Article 15 ("NYSHRL").

132.    At all relevant times, Mr. Jackson was over 40-years old.

133.    The Company, by and through their agents, harassed and discriminated against Mr. Jackson with respect to his compensation, terms, conditions, or privileges of employment because of Mr. Jackson's age.

134.    More specifically, the Company subjected Mr. Jackson to adverse actions, including, but not limited to, a hostile and harassing workplace, improper and intrusive monitoring, unjustified and/or overly harsh discipline and reprimands, and the termination of Plaintiff's employment because of Plaintiff's age.

135.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Mr. Jackson and/or conduct so reckless to amount to such disregard.

136.    As a direct and proximate result of the Company's violations of the NYSHRL, Mr. Jackson has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary damages, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

137.    Mr. Jackson seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, emotional distress damages, additional compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, punitive damages, reinstatement with full benefits and seniority, attorneys' fees, interest, and costs.

## COUNT IV

**(Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.)**

**Mr. Jackson v. the Company**

138.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

139.    At all relevant times, Mr. Jackson was over 40 years old.

140.    During all relevant times, the Company was an employer under definition of the Age Discrimination in Employment Act, 29 U.S.C. §§621 et. seq. (hereinafter the "ADEA") because it employed more than 20 persons for 20 or more calendar weeks within the previous 12-month period.

141.    The Company, by and through their agents, harassed and discriminated against Mr. Jackson with respect to his compensation, terms, conditions, or privileges of employment because of Mr. Jackson's age.

142.    More specifically, the Company subjected Mr. Jackson to adverse actions, including, but not limited to a hostile and harassing workplace, improper and intrusive monitoring, unjustified and/or overly harsh discipline and reprimands, and the termination of Plaintiff's employment because of Plaintiff's age.

143.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Mr. Jackson and/or conduct so reckless to amount to such disregard.

144.    As a direct and proximate result of the Company's violations of the ADEA, Mr. Jackson has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary damages, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

145.    Mr. Jackson seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), liquidated damages, reinstatement with full benefits and seniority, attorneys' fees, interest, and costs.

## COUNT V

**(Retaliation for Engaging in Protected Activity in Violation of New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Plaintiff v. the Company**

146.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

147.    Mr. Jackson engaged in protected activity under New York state law, including, but not limited to, by opposing, expressing protected concerns about, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Mr. Jackson's race, color, and/or age, as well as the unlawful retaliatory actions taken by the Company.

148.    The Defendants retaliated against Mr. Jackson for engaging in activity protected under New York state law, by subjecting him to adverse actions, including, but not limited to, a hostile and harassing workplace, improper and intrusive monitoring, unjustified and/or overly harsh discipline and reprimands, and the termination of Plaintiff's employment because Mr. Jackson engaged in protected activities.

149.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Jackson's exercising of, or enjoyment of, one or more rights granted by New York state law.

150.    The Company acted with malice and/or with reckless indifference to the state protected rights of Mr. Jackson.

151. As a direct and proximate result of the Company's violation of New York state law, Mr. Jackson suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

152. Mr. Jackson seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, emotional distress damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, restoration of his employment, attorneys' fees, interest, and costs.

## COUNT VI

### (Retaliation in Violation of 42 U.S.C. §§ 2000e et seq.)

### The Plaintiff v. the Company

153. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

154. Mr. Jackson opposed a practice made unlawful by Title VII, including by (i) opposing, expressing protected concerns about, and/or engaging in other protected activity regarding a hostile work environment based on race and/or color, and/or (ii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Mr. Jackson's race and/or color, as well as illegal retaliatory actions by the Company.

155.    The Company discriminated against and/or retaliated against Mr. Jackson for opposing one or more practices made unlawful by Title VII, including, but not limited to, by subjecting Mr. Jackson to adverse actions, including, but not limited to, a hostile and harassing workplace, improper and intrusive monitoring, unjustified and/or overly harsh discipline and reprimands, and the termination of Plaintiff's employment because Mr. Jackson engaged in protected activities.

156.    The Company acted with malice and/or reckless indifference to the federally protected rights of Mr. Jackson.

157.    As a direct and proximate result of the Company's violations of Title VII, Mr. Jackson has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

158.    Mr. Jackson seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, reinstatement with full benefits and seniority, attorneys' fees, interest, and costs.

**COUNT VII**

**(Retaliation in Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.)**

**The Plaintiff v. the Company**

159. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

160. Mr. Jackson engaged in protected activity under the ADEA, including, but not limited to, (i) opposing, expressing protected concerns about, and/or engaging in other protected activity regarding a hostile work environment based on age and/or (ii) opposing, expressing protected concerns about, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Mr. Jackson's age, as well as illegal retaliatory actions by the Company.

161. The Company discriminated against and/or retaliated against Mr. Jackson for opposing, expressing protected concerns about, and/or engaging in other protected activity related to one or more practices made unlawful by the ADEA by subjecting Mr. Jackson to adverse actions, including, but not limited to, a hostile and harassing workplace, improper and intrusive monitoring, unjustified and/or overly harsh discipline and reprimands, and the termination of Plaintiff's employment because Mr. Jackson engaged in protected activities.

162. The Company unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Jackson's exercising of, or enjoyment of, one or more rights granted by the ADEA.

163. The Company acted with malice and/or with reckless indifference to the federally protected rights of Mr. Jackson. The Company's actions, including its violations of the ADEA, were willful.

164. As a direct and proximate result of the Company's violations of the ADEA, Mr. Jackson has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

165.    Mr. Jackson seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), damages for diminished earning capacity and injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), liquidated damages, reinstatement with full benefits and seniority, attorneys' fees, interest, and costs.

WHEREFORE, the Plaintiff, Stacy Jackson, respectfully requests that this honorable court:

A. Schedule this matter for trial by jury;

B. Find the Defendant liable on all counts;

C. Award the Plaintiff his lost compensation and benefits (including, but not limited to, back pay and front pay),

D. Award the Plaintiff other monetary damages, including damages for his diminished earning capacity and injury to reputation;

E. Award the Plaintiff emotional distress damages;

F. Award the Plaintiff compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses);

G. Award the Plaintiff liquidated damages;

H. Award the Plaintiff punitive damages;

I.  Restore and reinstate the Plaintiff to his employment with full seniority and benefits;

J.  Award the Plaintiff his reasonable attorneys' fees;

K.  Award the Plaintiff interest and costs;

L.  Award the Plaintiff all other damages to which he is entitled; and

M.  Grant such further relief as is just and equitable.

Respectfully Submitted,

STACY JACKSON

By his attorneys,

THE LAW OFFICES OF WYATT & ASSOCIATES P.L.L.C

Date:   August 18, 2025          By:        /s/ Michael R. Varraso

Michael R. Varraso
mvarraso@wyattlegalservices.com
NY State Bar: 5619291
NDNY No.: 701795

Benjamin J. Wyatt
BWyatt@Wyattlegalservices.com
NY State Bar: 5604590
NDNY No.: 700752

The Law Offices of Wyatt & Associates, P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
69 State Street, 13th Floor
Albany, NY 12207
Telephone: (603) 357-1112
Facsimile: (603) 685-2868